of America, Case 20-1778.  May I please report, Daniel Habib, Federal Senators of New York, on behalf of Dwayne Stone. The District Court erred in denying Stone's Section 2265 motion to vacate his Count 13 conviction and 300-month sentence for using a firearm in connection with a crime of violence. It's undisputed that the trial judge in this case committed a constitutional error by instructing the jury that he could predicate the Count 13 conviction on a conspiracy to commit murder in the name of rapid terror. In United States v. Hayward, this Court held that the conspiracy to commit murder in the name of rapid terror is not Section 924C, a crime of violence, in light of Davis. And in United States v. Eldridge, this Court reiterated that the constitutional error occurs where, as he put it, disjunctive theories of culpability are submitted to a jury that returns a general verdict of guilty and one or more of the theories was legally insufficient. So the constitutional error established the question, in this case, of harmlessness, specifically whether the government is charged with serving on collateral review of establishing epidemiological evidence. The government has two arguments on that score, and neither is persuasive. First, the government contends that the conjunctively alleged Count required the jury, in fact, to find the use of a firearm in connection with both crimes. Can we skip over that, if you don't mind? Sure. I'd very much like you, if you could, turn to Eldridge and how Eldridge held, and I appreciate it was decided after both sides had briefed their cases, but you've submitted some letters on it. Why does that not govern here? We explained in Eldridge how a Yates error is evaluated for harmlessness. I understand you've got a different argument that was not raised in Eldridge, which is you think that Shepard constrains the way we engage in harmless error. So is your view that Eldridge was wrongly decided, and you can't blame anyone because people didn't make the right argument, or are you arguing that Eldridge may or may not have been rightly decided, but this case is somehow different from Eldridge? Maybe could you start with that? I could. My principle submission would be because both parties in Eldridge didn't address the methodological question of what the appropriate set of documents is in reviewing a data error for harmlessness, Eldridge can't be regarded as binding this time in a precedential manner on that question, and I'm happy to discuss at great length why I think our proposed approach is correct. But as a simple matter, can this Court reach the results that Eldridge advocated, notwithstanding Eldridge? The answer is yes. So because we didn't talk about the Shepard argument that you're raising now, you would argue that that's an open question. And so I would point to this Court's decision in Villanueva v. United States, cited in last week's 28J letter, which is nearly one of the long-awaited cases in which this Court has said that issues that are present in the background of the case but not brought to the Court's attention can't be regarded as having resolved those issues sub celestial. So assuming that we're correct, explain to us why you think Shepard governs here and why your argument isn't foreclosed by cases like Nader and Johnson where the Supreme Court has said, look, you may have an underlying Sixth Amendment issue. You misinstructed a jury on an element or maybe you completely omitted an element. So you've got a Sixth Amendment violation in spades. But we're going to engage in harmlessness analysis or plain error analysis that does look at, for example, the weight of the evidence. Why isn't that, maybe not flow from Eldridge, but why doesn't that answer flow from Nader and Johnson? Because I think your argument here is that you have a Sixth Amendment issue. You misinstructed the jury on some of the predicates. Why aren't we within that large category, a subspecies of a Nader and Johnson situation? I would say this, Your Honor. The question that's presented when a jury has returned a general verdict of guilty on a 924C count and has been instructed on both valid and invalid predicates, the question for purposes of harmlessness analysis is, can we tell what the jury did? And if the jury in fact relied on an invalid predicate, has the defendant suffered prejudice? Well, wait. Is that really the question? I didn't think that's the question of Yates. I thought Yates didn't say, we can tell what the jury relied upon. We're saying even if they relied upon something wrong, would their verdict nevertheless have been the same? That's different from Griffin when you're dealing with the evidence and you're saying there's two factual issues. We're going to presume that the jury relied on the factual premise that was in fact supported by sufficiency of the evidence. But when we're in Yates, we don't ask the question of, did they think something wrong? But even if they did think something wrong, do we think that they, within a requisite level of certainty, would they have reached the same answer? Isn't that what Yates told us? I understand the distinction, Your Honor. But when we put it this way, we're asking on collateral review whether the error had substantial and serious effect on the verdict. And if I can say as a matter of historical fact, the jury relied on an invalid predicate to return the conviction, I think it's difficult to say that the error didn't. Well, then how do you know, though? I thought the whole point is there's a valid predicate, there's an invalid predicate. So how is it that you're now asserting to us that we know, as a matter of historical fact, they were relying on the other one? Because they didn't check it off in the box. So we're left in a state of uncertainty, and then aren't we supposed to then look at the strength of the evidence? So that's, in fact, my precise point, Your Honor, is that because we're in a state of uncertainty, O'Neill tells us how to resolve uncertainty in a case like this. Because we cannot say with the requisite level of confidence by examining materials like the indictment, like the jury instructions, like the verdict, which, by the way, But why not the evidence? So again, I would say that in this particular context, the context of assessing the validity of 924C convictions, the Supreme Court and this Court prior to Eldridge have consistently said that the appropriate analysis is categorical. But that's to determine whether the predicate is a predicate, not whether the jury actually relied on the predicate. Those are two different questions. And the Shepard analysis, I thought, was grounded in the Sixth Amendment, saying you've got to stick to Shepard documents, otherwise you're going to violate the Sixth Amendment. Here we're saying, yeah, there's the Sixth Amendment instructional problem. We got that. Now we're beyond it, and we're asking about harmlessness. I think, let me say a few things. One, I think we are saying, to be precise about a constitutional point, our claim is that there's a Fifth Amendment paragraph in the jury instruction which submitted a big threat. I would say, second, that the concerns that animate the categorical approach are not strictly Sixth Amendment concerns. The Supreme Court has said, in cases such as Taylor and Dacon and Mathis, that the set of concerns driving the application of the categorical approach include practical as well as equitable considerations. And so, for example, it will often be very difficult as a practical matter to answer the question either in the way that I'm framing it, what did the jury do, or in the way that Your Honor is framing it, what can we say that the jury would have done? In addition, as to equity, it would be profoundly inequitable to make a 301-sentence term today on a question that the defense had no incentive to contest at the time of trial and had it been on notice that this question would matter. Well, that's how harmlessness often works, isn't it? We wouldn't necessarily have the ability to contest it when we find an error on appeal. And what I'm suggesting in answer to Judge Nagini's question is that it's not just the Sixth Amendment problem, which I see is your point, right, that underneath the omission of the element can be harmless notwithstanding the absence of a jury finding. I understand that point. What I'm suggesting is I'm trying to broaden the set of justifications for application of the categorical approach. Congress is practical as well as equitable. So can I ask just how much uncertainty we have here exactly? I mean the allegations of conspiracy to murder and then murder are that he got a gun from the co-conspirator and went and shot the person in the face. How is it plausible that the jury decided that he possessed a gun as part of the conspiracy but not as part of the murder? Aren't they all just intertwined? So I have a number of responses, but let me just sort of make a threshold point. If the court disagrees with our methodological premise, which is that the categorical and modified categorical approaches govern the harmlessness of inquiry, I respectfully submit that the appropriate disposition here would be to re-advance. Wait, sorry. When you say the categorical approach governs the harmlessness inquiry, you're saying basically we should decide what a jury in the abstract might have done acting on these instructions? Is that— No. To be precise, what I'm suggesting is that in analyzing whether the questions frame that what did this jury do or what would the jury have done given the proper instructions, the set of materials that this court should consult in answering those questions is limited to the shattered materials. But aren't we trying to determine what this particular jury did in this particular case? I would submit that we cannot know with the records that we have searched what this particular jury did in this case. So I don't just answer the question that I had posed. So how is it plausible that the jury could have possibly concluded he had a gun as part of the conspiracy to murder but not as part of the murder, which they decided that he had committed? So let me—two responses to that. First, the court's question assumes, not unreasonably, that the jury would apply actual findings made with respect to one count to another count. But we know that, in fact, this jury didn't do so. If I could unpack that briefly. With respect to Mr. Stone's co-defendant, James Teare, the jury convicted him on count 10 for a substantive murder in aid of bacteria of the individual named Ricky Toobies. However, the jury also found not true for bacteria in act 6, count 1, which was based on the exact same facts. So it's not certain that the jury's conviction on count 12 necessarily implies— and that's the legal standard I can articulate even in Eldridge—necessarily. Did we say that it necessarily implies or did we—my recollection— You know that. I might not know. I might be the least reliable person here on Eldridge. But my recollection is that we stated the threshold of certainty necessary, but then we went on to say, effectively, that that threshold had been exceedingly well, exceedingly well surpassed because the evidence, which I recall was actually quite analogous to the evidence here, which is that the defendant just went up and shot a guy. And whether you called it attempted murder, conspiracy to murder, or murder, the entire and sole theory was that he walked up, pointed a gun at somebody, or he pulled up and launched the bullet, which I thought was quite analogous to here. So I'm just kind of interested in—I understand your theory that, well, maybe there's some other count as to some other defendant which suggests this was a jury that was prone to inconsistency and therefore we should not presume consistency here. But if you're just trying to distinguish, say, Eldridge from Hayward, where you came out—the court came out with different results based on the particulars of the kind of murder and the kind of charges here, why isn't this squarely in Eldridge land and not in Hayward land? So two—again, two responses are on there. First, in Eldridge, this Court pointed to not only the strength of the evidence supporting a valid attempted homicide-robbery predicate, but also the link between the jury's finding that the firearm had been branched and the valid predicate. That is to say, the evidence was that the defendant pointed the gun at the robbery victim. Here, the 924C3 count was charged—and again, this is prior to it leaving, so the jury wasn't asked to make a finding of abuse, carry, possess, branch, discharge. The jury was simply charged on abuse, carry, possess. And so there's nothing that would have prevented the jury from relying on a carrying theory. But was there any evidence presented to the jury, any argument made by the government to support your theory that said, jury, you may not think that he shot this man, but he was probably carrying a gun in connection with the murder. Was there anything like that presented? No, Your Honor. The trial defense was that Mr. Stone was innocent. So I guess that's what we're struggling with, right? How do we get into this alternative universe that nobody ever talked about when we're trying to figure out what happened or would have happened at the trial with the evidence and the arguments that were made? The most that I can say—and you can, Your Honor—the most that I can say is that the Counsel on Murder and Conspiracy was charged in the indictment on both direct and engaging and evading theories of liability. The district court in Paris referred to both of those sections of the New York penal law in summarizing the indictment to the jury. And so there is a universe where it's conceivable that the jury believed A, that Mr. Stone, in cooperation with Ms. Romero-Baker, formed an agreement to murder General Washington, that B, Mr. Stone carried a firearm from the place where the meeting occurred to the place where the murder occurred, but that C, accepted the defense's suggestion that the actual shooter was Romero-Baker. And so, again, without contesting the proposition that a conviction secured pursuant to an evading and evading theory of liability can suffice to support non-claiming force of liability, it's a conceptual path where the jury can say— It doesn't seem plausible in this case, does it? And so with respect, because it's conceptually available and Eldridge spoke of— So you're saying we should decide whenever it's conceptually available. No, no, you're wrong. I'm not asking us to win on that ground before this court. I'm saying if this court, A, determines that Eldridge supplies the appropriate frame of a harmlessness analysis and rejects our argument to the contrary, that the appropriate disposition would be to remand it to allow the district court to conduct a prejudice analysis in the first instance, which wasn't done. Well, can I ask even about Hayward? So in Hayward itself, we distinguish this prior summary order Vasquez, which had a similar issue, and it said, We concluded that because the robbery scheme was presented as part of the proved narcotics scheme and because the defendant points to nothing in the record showing that the two schemes were separable, the firearms conviction rested on a valid 924c drug trafficking predicate. And the court says that the Vasquez principle is sound in general. So here, isn't it all one inseparable scheme? He gets the gun and then shoots the guy in the face? I mean, it's not presented as two different things. I mean, you're saying it's conceptually possible they could have distinguished it, but that doesn't seem like that's a plausible way that the jury would have behaved. So my understanding of Vasquez, Your Honor, is that when this court used the phrase, answer please, recline, and then picked up on that phrase in Eldridge, that's how we understood the specific theory of liability and finding liability in Vasquez, which was a Pinkerton conviction on a 924c count, where the conspiracy of which the defendant was found to have been a member was a conspiracy to rob drug dealers. So the defendant would not have been convicted if the jury did not agree both that he conspired to rob and that he conspired to rob drugs, such that there would always be a valid drug trafficking predicate. Such that both of them are necessarily drug predicates. Correct. But then we wouldn't have to say that they were inextricably intertwined. We would just have to say that they were both drug predicates, right? No, what I mean is that the analytical path that Vasquez takes is if the jury relied on what you said is an invalid predicate to rob that conspiracy, conspiracy to rob what? Drugs. So that if the jury relied on the invalid predicate, there's no harm because the agreement was an agreement to rob drugs. And consequently, had the jury gone down that impermissible path— No, I understand. I guess just what I'm reacting to is we could have described that then not as two alternatives that were inextricably intertwined. We could have said they could have been two predicates that each would have qualified. That would have been a more natural way to express the thought that you're describing. Except that under the categorical approach, which, again, we're now applying just to determine whether or not these things are valid predicates, not what the jury did. But under that approach, they have that conspiracy to— they have that conspiracy to have them evaluated as such. The nature of the property to be taken wouldn't factor into the categorical analysis. So that—I'm sorry. Can I ask about the earlier point you made about how the jury seemed to have these inconsistent decisions? If they didn't, could we then infer what made logical sense? Is that key to this argument? I think it assists the harmlessness argument. So we're now in the zone where the court is considering the full record. I think one thing—right? If it is going to be a fact-sensitive, fact-immersed analysis of harmlessness, I would say a number of things. I would make this jury a consistency point. I would make this case an independent point. And there may be more. This is a four-week trial. The transcript is 5,000 pages long. There are 22 counts and multiple public amendments. And that's why it's—in the nature of the analysis, some suggestions should be conducted by a district court for the benefit of the full record. Why would that be necessary if the evidence was overwhelming? If we're going on the evidence-based approach, you simply pose the question, what would the jury have done had the charge been proper? That's what we do usually when there's an erroneous charge of whatever nature. And—or there's an error in the charge. And then you assume it to be a proper—so here it would be whatever it is. Count the life, I guess. The actual murder. Suppose they were just charged that that was a predicate act and that was it. Was there sufficient evidence—not sufficient evidence, such evidence that you can't say that the failure was harmful? And what I suggested, again, we're considering the full scope of the evidence, is that for at least two reasons. One, the inconsistency as reflected with respect to the Code Amendment. And two, the possibility of aiding and abetting liability, which supplies a conceptual path to a fine-week trial unless it's only in connection with a conspiracy that this court today, on this present record, can't have the requisite amount of confidence. Well, sir, you have reserved two minutes for rebuttal. Is that right? Thank you very much. We've kept you over your time. Mr. Axelrod? Good afternoon. May it please the Court, I'm Nick Axelrod on behalf of the United States. Judge Arnett, I'll borrow from you. We are squarely in Albridge land, Your Honor. Well, and then I'm going to ask you, since you're going to go there. It's true, isn't it, that the Shepard argument was not raised in Albridge, right? I agree that it was not raised in Albridge, Your Honor. So would you agree then that, you know, the Shepard argument is not necessarily foreclosed as a matter of law by Albridge because it simply wasn't raised and we didn't express any view on that? I think it's foreclosed by the Bracken-Hedge measure. And I think it's not surprising that it wasn't raised in Albridge because Supreme Court precedent says that's not how you conduct harmlessness analysis. In other words, your view is that this is a routine harmless error case where an error has been made in the charge and the question is what would the outcome have been had the charge been proper based on the evidence? That's correct, Your Honor. As I was saying, the court's recent opinion in the United States against Albridge does resolve this case. Albridge steps out the applicable analysis and it dictates the court's conclusion whereas here, a 924C count is based on both a valid and an invalid predicate that arise out of a single incident, a single continuous course of conduct. Under Albridge, the error is harmless. To the petitioner's argument that harmlessness analysis is limited to Shepard documents, that's inconsistent with the methodology employed in Albridge. I concede that this question wasn't presented in Albridge but it's inconsistent with the methodology employed. It's foreclosed by the Supreme Court's decision in Hedgetown which, by the way, cited the decision in Nader and applied Nader to a Yates error and which the court cited in Albridge. And the harmless error analysis that preexisted Mattis and the various categorical approach cases has not been invalidated by the Supreme Court. Harmlessness analysis has not been. In terms of harmless analysis, right? I mean, it's the same old harmless analysis that goes back to Breck. Yes, it's the same harmless analysis that goes back before Breck to Kodiakos. Exactly. It's the same that's borrowed in Breck and since Chapman, constitutional error of this nature has been subject to harmlessness analysis. Yeah, and on that point, and maybe this doesn't turn on it, but correct me if I'm wrong, Albridge was a direct appeal case, right? Albridge was a direct appeal case. And it was on plain error? That's correct, Your Honor. And that does, could conceivably in some cases make a difference because the standard, and I would just note, Your Honor, as far as I'm concerned, Albridge does not cite Vasquez. What Albridge does… Well, Vasquez was a summary order, right? That's correct. But the standard under Albridge is actually slightly different. Albridge, in note 16, Your Honor, describes the reasonable probability or the reasonable doubt standard that is applicable in a plain error context on direct review. Now, that standard is actually more difficult for the government to meet than the standard that governments disappeal on collateral review under direct and under hedge cap, which asks rather if there's a grave doubt, i.e., if the court is impeccable as to whether the error is harmless, then the trial goes to the defendant. And would your suggestion be that a defendant who doesn't preserve an issue and then raises it on collateral review, and for understandable reasons, all this case law is happening afterwards, but should certainly not be subjected to a more favorable or more forgiving standard of review on collateral review than they would get on plain error review in the case of still on direct appeal? In other words, it shouldn't get harder and then easier from preserved error to plain error and then easier again when you get to collateral review, right? That's exactly right, Your Honor. I think the practice is quite clear about the potential reasons why the standard is actually more difficult for the defendant on collateral review because there are particular interests in the finality of verdicts that apply on collateral review. But does it get meaningfully different from the standard on plain error review? Pardon me? Does it get the standard for measuring prejudice? Does it differ in any meaningful way from the standard for assessing prejudice under plain error when we shift the burden of proving all four prongs of plain error, including prejudice? They're shifted all back to the defendant. How is it materially different then, the prejudice inquiry on plain error or in 2255? I think there may be some cases, and it's certainly not this case, where an error is not harmless on direct review under the plain error test because there is a reasonable probability, possibility, that the error affected the jury's judgment. But nonetheless, that error would be harmless on collateral review because there is not a grave doubt. That is certainly not this case. I don't think the court needs to grapple with the differences between those two standards. It's just not presented here because there is no doubt that here, where all the facts overlap, where there were two clawed murderers who testified to a very short conspiracy, a conspiracy that started moments before the murder, that took place within a two or three block area of the murder. But what about opposing counsel's argument about aiding and abetting and how it's conceptually possible that they would have thought that he had the gun for the conspiracy and not as part of the murder? So that's not how the case was argued to the jury. The defense counsel never, never suggested that somehow this defendant was a member of the conspiracy but not the shooter. It was a straight up and down, that he believed the cooperators and Mr. Stone was the shooter, or he didn't believe the cooperators at all and Mr. Stone was not there. What about the argument about the inconsistent verdict? That's not this defendant. That's James McTighe. And I would note also that the elements of a RICO predicate and the murder in Native Rappaport are slightly different. I'm not sure, candidly, what the jury was doing with Mr. McTighe, but I know, as to Mr. Stone, is that the jury convicted Mr. Stone of the substance of murder, it convicted him of the conspiracy, on all the same terms as the substance of his murder, and it convicted him of the knife-knife post-mortem. Thank you very much. Mr. Habib, you've reserved some time. Thank you. I want to make a few brief points. First, Judge Sardegna, I don't think there's anything anomalous about the standard of review or argument here notwithstanding that we're in a 2255 posture.  I don't think there's anything anomalous about the standard of review or claim raised for the first time on 2255. The movement will be subject to a procedural default offense, which will subject it to a much more rigorous standard than is true on camera. Now you have to show cause and prejudice, right? Correct. And so actual prejudice is clause of cause. And could you just clarify for me, my recollection was that that was something, was that not argued by the government here or conceded? Or where are we in terms of cause and prejudice on this? I'm a little confused, honestly, about why that's not an issue before us. The answer is quite straightforward, Your Honor. The government didn't raise a procedural default in the district court. And so under this Court's decision in Kennedy, 126 F. 3rd at 359-60, the defense is waived. Right. So that's something that the government is free to assert. If they don't assert it, it's out the window, and we don't consider it. It's a federal defense, and that's all in the Kennedy. Judge Bernanke, let me, with respect to the eating and abetting theory, let me, I do want to be candid. I don't want to oversell this in a way. The indictment charged both direct and eating and abetting theories of liability. The district court, the trial court, in its explanation of the indictment to the jury, referred to both of those sections in the penal law. But it didn't go further to provide a separate eating and abetting instruction. So I don't want to oversell what the record shows. It's more in a way of demonstrating that there are questions about the record that could be explored and whose impact could be assessed by the trial. Are there questions? I mean, if it was never argued at the trial, I mean, we're just trying to explain what the jury did. And the answer—it wasn't judgment, actually. The answer is because it wouldn't have mattered prior to this. If the jury accepted that Mr. Stone carried the gun in connection with the conspiracy, if not the substantive murder, that would have— I understand that that wouldn't have mattered, but the question is, is it possible that when we're asking if it's possible the jury decided that he was guilty of the murder because of eating and abetting and so therefore conceivably had the gun as part of the conspiracy but not as part of the murder, if that's possible, you would think that there would be evidence before the jury suggesting that. But if, in fact, the whole argument of the case was that that's not what happened, that he, in fact, took the gun and shot him in the face himself, then when we're trying to determine what predicate the jury was relying on, why wouldn't we just say, well, obviously the jury thought he had the gun and shot him and shot the victim? Well, it's true that the defense's principal argument was that the cooperator shouldn't be believed and that Mr. Stone wasn't participating in the murders. However, the defense also suggested that Rommel Baker, the principal cooperator, is liable to lie and put a stop to the fact that he was the shooter. So the jury kind of has a pathway. The jury kind of said, we believe you were part of the plan, but we also agree that Rommel Baker had a reason to lie and think that he was the shooter rather than himself. And so then the jury would have convicted him of the murder based on an aiding and abetting theory that the government didn't even argue. So, again— But that wasn't the defense, was it? No, Your Honor, the defense was that Mr. Stone wasn't— I mean, don't we take a realistic look at what happened at the trial and how it was argued and presented to the jury? And what I'm suggesting is that if we're taking seriously communique, if we're applying the set of precedents that hold that a court requires certainty in conducting this formal analysis, if we apply the statements in Eldridge to the effect that that convention was affirmed because the verdict would have been inconceivable, in the context of both the inconsistent verdict and the possibility, which, again, granted, wasn't an argument that was presented to the jury, but was not unavailable to the jury given the language of the charging history of the jury. Okay, so let's think about that. So if there's a theory that is conceivable, but we just look at the evidence and, like, there's no way the jury really was thinking that, what do we do with that? So if we're in the sort of alpine space where we're now looking at the full record, which, again, I'm suggesting is something that this court should defer to the district court, if we're in that space, the government is absolutely free to argue that there's no way the jury could have done what she suggested because we never asked them to. And it would be our place to say, well, in fact, it was an available path to the jury, and a jury that had doubts about who the actual shooter was, Mr. Stone, or, as suggested by the defense for Mel Baker, could have come to this conclusion. In particular, in a case where the jury is doing other things that don't present as logical or consistent to a panel of appellate judges, that that question can be addressed by Judge Glasser, who, by the way, presided over the trial in the first instance, and there would be nothing inappropriate about that disposition. And what kind of an inquiry is he conducting that we can't do looking at the record? The only thing that he would do is that he would have the benefit of the entire trial record, and he would have the benefit of the parties' focused arguments on the harmlessness question, in light of the superhuman values provided by Elbridge and Baker, which wasn't available in the first instance. Thank you. Okay. Thank you very much to both of you. As everyone will argue, we will reserve decision.